IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RASHEED NIFAS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Civil Action No. 08-834 |
| | ) | Chief Magistrate Judge Amy Reynolds Hay |
| JEFFREY A. BEARD; DAVID J. | ) | |
| WAKFIELD; HARRY E. WILSON; | ) | |
| BRIAN V. COLEMAN; DANIEL P. | ) | |
| BURNS; ERIC T. ARMEL; DEBRA A. | ) | |
| MAHLMEISTER; RHONDA HOUSE; | ) | |
| DAVE P. LINK; SAMUEL POPOVICH; | ) | |
| DANIEL HOOPER; MARY A. KUSHNER;) | | |
| SHARON M. BURKS; CINDY G. | ) | |
| WATSON; WALLACE LEGGETT, | ) | |
| | ) | |
| Defendants | ) | Re:  Dkt. [46] |

**MEMORANDUM OPINION AND ORDER**

HAY, Chief Magistrate Judge

Rasheed Nifas[1] is a prisoner currently in the custody of the Pennsylvania Department of Corrections at SCI-Fayette.  He is serving a life sentence for first degree murder committed on or about October 24, 1989, when Plaintiff was only 20 years old.[2]  By way of background and according to a security report (the accuracy of which Plaintiff disputes), as of November 22,

---

[1]  It is not clear whether Plaintiff's current name is Rasheed Nifas or Rasheen Nifas.  The docket has his name listed as Rasheed.  This is the name he likewise used on his pro se pleadings in the caption.  See, e.g., Dkt. Nos. [53], [56], [57], etc, and as his signature, Dkt. Nos. [53] at 22; [56] at 4; [57] at 36.  This is the name that the Defendants use in their pleadings.  See, e.g., Dkt. [47] at 1.  However, he is listed on the DOC Corrections website as being Rasheen Nifas, also known as Rasheem Grant, and Carl Schultz.  That website is available at:

   http://www.cor.state.pa.us/inmatelocatorweb/

[2]  The Court takes judicial notice of the Philadelphia Court of Common Pleas website in the case of Commonwealth v. Rasheen Nifas, No. CP-51-CR-1004371-1991 available at

   http://ujsportal.pacourts.us/DocketSheets/CPReport.aspx?matterID=103560952

2007, Plaintiff received a total of 32 misconducts, including three for assault, six for fighting, and nine for refusing to obey an order.  Three of the misconducts were dismissed without prejudice.  Plaintiff also has a history of stalking or harassing females who are present in the prison.  For instance, on March 27, 2003, Plaintiff was placed on administrative custody ("AC") for stalking a female intern and was released back to general population when the student's internship was completed.  On April 29, 2003, Plaintiff was again placed in AC due to inappropriate exchanges with a female Corrections Officer Trainee.  As a consequence, Plaintiff was transferred to another prison and a separation[3] was provided between him and the Trainee.  Eventually, Plaintiff was transferred to SCI-Fayette for having harassed three female staff members at SCI-Dallas.  A separation was placed between Plaintiff and the those SCI Dallas staff members.  Plaintiff disputes the accuracy of these reports of harassing female staff.  See, e.g., Dkt. [53-3] at 2.

Plaintiff's transfer to SCI-Fayette occurred on May 23, 2006.  Between then and November 22, 2007, Plaintiff received a total of six misconducts, including one for fighting and one for threatening an employee.  As a result, Plaintiff received total sanctions of 250 days of Disciplinary Custody ("DC").  On July 11, 2007, Plaintiff approached a female Corrections Officer Trainee and asked her whether, if he wrote a letter to her, would she accept the letter. She told Plaintiff that if he did write her a letter, she would confiscate it and write him a misconduct and warned him that his behavior would not be tolerated.  Based upon his history at other institutions and this incident at SCI-Fayette with the trainee, as well as other incidents at

---

[3] A separation, "as its name suggests, is a document which states that an inmate should be separated from another inmate."  Morton v. Vaughn, No. Civ. 93-6691, 1994 WL 172718, at *5 n. 2 (E.D.Pa. May 4, 1994).  Apparently, a separation can also be used to separate an inmate from a staff person.

SCI-Fayette, it was recommended that Plaintiff be transferred out of SCI-Fayette by staff there. However, that recommendation was rejected and Plaintiff was maintained at SCI-Fayette under AC and also was placed on the Restricted Release List ("RRL"), which means that Plaintiff cannot be released from AC without prior approval from the DOC Secretary or the Secretary's designee.  Dkt. [47] at 3, n. 3.

Plaintiff's placement in AC and on the RRL is at the heart of Plaintiff's civil rights complaint.  Plaintiff complains that his placements in AC and on the RRL were done in retaliation for his filing of grievances and without procedural due process.  He also complains that while he was on AC status at SCI-Fayette, he was denied access to the courts.  In addition, he makes complaints that he was denied the right to practice his religion while in AC.  He also complains that his conditions in AC constituted cruel and unusual punishment.  He apparently also makes state law claims.

Discovery closed in this case on January 20, 2009.  <u>See</u> Dkt. [31].  Presently before the court are the parties' motions for summary judgment.  Dkt. Nos. [46] & [56].

**Standard of Review**

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).  The moving party bears the initial burden to show or point out why there is no

genuine issue of material fact.  Walters ex rel. Walters v. General Motors Corp., 209 F.Supp.2d

481, 484 (W.D. Pa. 2002).  Once that burden has been met, the non-moving party must set

forth "specific facts showing that there is a genuine issue for trial . . ." or the factual record will

be taken as presented by the moving party and judgment will be entered as a matter of law.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In reviewing the

summary judgment evidence, the Court has no duty to search the record for triable issues; rather,

it need rely only on those portions of the evidentiary record to which the nonmoving party directs

its attention.  See Guarino v. Brookfield Township Trustees, 980 F.2d 399, 403 (6th Cir. 1992).

"The substantive law governing the dispute will determine which facts are material, and

only disputes over those facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment."  DeHart v. Horn, 390 F.3d 262, 267 (3d

Cir. 2004)(internal quotations omitted).  An issue of material fact is genuinely disputed only if

the evidence is such that a reasonable jury could return a verdict for the non-moving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  "Where the record taken as a whole could

not lead a reasonable trier of fact to find for the non-moving party, there is no genuine issue for

trial."  Matsushita, 475 U.S. at 587.  The inquiry involves determining whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law.  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d

Cir. 1990).  If a court, having reviewed the evidence with this standard in mind, concludes that

"the evidence is merely colorable . . . or is not significantly probative," then summary judgment

may be granted.  Anderson, 477 U.S. at 249-50.  Moreover, it is not enough for the nonmovant to

show that there is some dispute as to facts, rather, "only disputes over facts that might affect the

outcome of the suit will prevent summary judgment." <u>Anderson</u>, 477 U.S. at 248.  <u>Accord</u>

<u>Rexnord Holdings v. Bidermann</u>, 21 F.3d 522, 525 (2d Cir. 1994) ("[T]he mere existence of

*some* factual dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment[.]"); <u>Dykes v. DePuy, Inc.</u>, 140 F.3d 31, 36 (1ˢᵗ Cir. 1998) ("summary

judgment is not precluded by just any factual quibble").

      In short, the summary judgment motion is an evidence testing device to see if there is

sufficient evidence to support a party's position with respect to an issue for which that party bears

the burden of proof at trial so as to justify holding a trial.  <u>See</u>, <u>e.g.</u>, <u>Albiero v. City of</u>

<u>Kankakee</u>, 246 F.3d 927, 933 (7ᵗʰ Cir. 2001)(summary judgment "is the . . .  moment in a lawsuit,

when a party must show what evidence it has that would convince a trier of fact to accept its

version of events.").

      **Discussion**

        **A.  Failure to Exhaust**

      Plaintiff failed to exhaust his administrative remedies concerning a number of his claims

prior to initiating this suit.  Thus, those claims must be dismissed.

      The Prison Litigation Reform Act ("PLRA") amended the Civil Rights of

Institutionalized Persons Act, 42 U.S.C. § 1997e, that required prisoners to exhaust

administrative remedies available to them prior to a prisoner bringing suit in federal court

concerning prison conditions.  <u>See</u> 42 U.S.C. § 1997e(c)(2).  <u>See</u> <u>also</u> <u>Nyhuis v. Reno</u>, 204 F.3d

65 (3d Cir. 2000); <u>Booth v. Churner</u>, 206 F.3d 289 (3d Cir. 2000), <u>aff'd</u>, 532 U.S. 731 (2001).

Specifically, the PLRA amended the Civil Rights of Institutionalized Persons Act, 42 U.S.C. §

1997e, to provide that  "[n]o action shall be brought with respect to prison conditions under

section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  The Supreme Court has declared that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). See also Booth v. Churner, 206 F.3d at 295 (explaining the statutory phrase "prison conditions" to include claims concerning "actions . . . [that] make their [i.e. prisoners] lives worse.").  Thus, the cCourts have made clear that any claim about prison life is subject to the exhaustion requirement, thereby interpreting the exhaustion requirement very broadly.

Furthermore, not only is the exhaustion requirement broad, it is also mandatory.  The Court of Appeals for the Third Circuit has made clear that Section 1997e(a) "'specifically mandates' that inmate-plaintiffs exhaust their available administrative remedies." Nyhuis v. Reno, 204 F.3d at 73 (internal citations omitted).  Therefore, "it is beyond the power of this court ... to excuse compliance with the exhaustion requirement...." Id.  Accordingly, the Third Circuit has concluded "[o]ur bright line rule is that inmate-plaintiffs must exhaust all available administrative remedies." Nyhuis, 204 F.3d at 75.  Furthermore, institutionalized persons, such as prisoners must exhaust their administrative remedies even if the administrative remedy cannot provide them with the relief they seek, e.g., money damages.  See Nyhuis v. Reno.  Because Plaintiff's allegations in the complaint constitute an "action brought with respect to prison conditions" within the meaning of the PLRA, the exhaustion requirement provisions of Section 1997e(a) apply herein.

6

To the extent that Plaintiff relies upon the DC-ADM 804 grievance procedure to satisfy his exhaustion requirement, see, e.g., Dkt. [8] at 8, ¶¶ 83 to 86, the court notes that Plaintiff did not file some of his grievances (upon which he relies to assert his exhaustion of administrative remedies) until **after** he initiated this current suit.[4]  For example, Plaintiff makes a claim of being denied his First Amendment right to practice his religion when he was allegedly denied his right to participate in a fast and when he was allegedly denied his visits from a religious adviser.  See, e.g., Dkt. [65] at 21 to 22. Cf. Dkt. 8 at 6, ¶ 57; id., at 7, ¶ 68; id., at 9, ¶ 92.  Plaintiff also claims that these alleged denials also violated his statutory rights under the Religious Freedom Restoration Act and the Religious Land Use and Institutionalized Persons Act.  See, e.g., Dkt. [8] at 9, ¶ 92; Dkt. [65] at 22.  However, the initial stage grievance (i.e., the first step of three steps under the DOC grievance system) to which he points in order to satisfy the exhaustion requirement, i.e., Grievance No. 232345, which he himself provided, was not filed until June 16, 2008, which is the very date he signed his complaint (and so, pursuant to the prisoner mail box rule, is the date he is deemed to have filed his complaint), five days after he signed his IFP application, and only one day before the Clerk's office filed this case.  Dkt. [53-51] at 2.

In a similar manner, Plaintiff claims that his First Amendment right of access to the courts was denied by denying him access to the mini law library which is located in the Restricted Housing Unit area and his right of access was also denied when he was refused a self help litigation manual that is not kept in the mini law library.  See, e.g., Dkt. [8] at 11, ¶ 106.

---

[4]  To the extent that Plaintiff would rely upon DC-ADM 802 (concerning appeals for disciplinary or administrative custody), what Plaintiff refers to as "AC appeals," to satisfy the exhaustion requirement, the court notes that Plaintiff has pointed to no 802 appeals concerning religious exercise or access to courts or retaliation/denial of equal protection which were filed and fully exhausted prior to the initiation of this suit and there don't appear to be any in the record.

Plaintiff points to Grievance No. 230672, which he himself provided, as establishing that he exhausted his administrative remedies, but the court notes that Plaintiff did not initiate this grievance until May 30, 2008.  Dkt. [53-43] at 2.   Plaintiff did not file his first level appeal until June 3, 2008.  Dkt. [53-43] at 4.  Plaintiff then did not file his final appeal until June 13, 2008, Dkt. [53-43] at 5, which is two days after his signed his IFP application in this case, and merely three days prior to signing his pro se civil rights complaint and four days prior to having the case officially docketed in this court.   The response to the Plaintiff's final appeal, which he himself provided, was dated June 25, 2008, nine days after he signed his pro se complaint and eight days after his case was formally entered on the docket.  Dkt. [53-43] at 6.

In like manner, Plaintiff claims that his right to be free of retaliation was violated as well as his equal protection rights when he was allegedly denied privileges while on AC status that were granted to others similarly situated.  He claims that the members of the PRC, who are Defendants Burns, Armel, and Mahlmeister,[5] denied him such privileges in retaliation for his filing of grievances.  Dkt. [8] at 10, ¶ 104; id., at 8, ¶ 88.  Plaintiff points to Grievance No. 228547 as support for the proposition that he exhausted his administrative remedies.  See, e.g., Dkt. [53-40] at 1 to 6.  However, the court notes that Plaintiff did not file the first step initial grievance until May 13 or 14, 2008.  Id., at 2.  The first level appeal was not filed until May 28, 2008.  Id., at 3.  The final level appeal was not filed until June 3, 2008.  Id., at 5.  The response to that final level appeal was not filed until June 26, 2008, after Plaintiff had filed the instant lawsuit.  Id., at 6.

The rule is that "[t]he 'available' 'remed[y]' must be 'exhausted' **before** a complaint

---

[5]  Dkt. [8] at 2, ¶ 14; id., at 3, ¶¶ 15 - 16.

under § 1983 may be entertained." <u>Booth v. Churner</u>, 532 U.S. 731, 738 (2001)(emphasis

added). <u>Accord</u> <u>Dancy v. Collier</u>, 266 Fed.Appx. 102, 104 (3d Cir. 2008)("A prisoner who

challenges prison conditions must exhaust available administrative remedies **before** filing suit in

federal court.")(emphasis added); <u>Oriakhi v. U.S.</u>, 165 Fed.Appx. 991, 993 (3d Cir.

2006)("Oriakhi's administrative remedies were not exhausted prior to the initiation of suit. The

fact that he completed the administrative review process before the District Court reached the

exhaustion question is of no consequence. Indeed, there appears to be unanimous circuit court

consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting

administrative remedies after the filing of the complaint in federal court."); <u>Thompson v.</u>

<u>Michigan Dept. of Corrections</u>, 23 Fed.Appx. 486 (6th Cir. 2001). <u>Accord</u> <u>Neal v. Goord</u>, 267

F.3d 116, 122 (2d Cir. 2001) ("Subsequent exhaustion after suit is filed therefore is

insufficient."), *overruled on other grounds by*, <u>Porter v. Nussle</u>, 534 U.S. 516(2002); <u>Freeman v.</u>

<u>Francis</u>, 196 F.3d 641, 645 (6th Cir. 1999) ("The plain language of the statute makes exhaustion a

precondition to filing an action in federal court . . . . The prisoner, therefore, may not exhaust

administrative remedies during the pendency of the federal suit.").

     Moreover, the rule contemplates that a prisoner must await the response to final appeal

prior to initiating the civil rights action. <u>Caldwell v. Jin</u>, NO. CIV.A. 08-1465, 2008 WL

5115039, at *12  (W.D.Pa., Dec. 4, 2008)("a prisoner must await the response to final appeal

prior to initiating the civil rights action"); <u>Brower v. Georgia Dept. of Corrections</u>, No. CV

307-031, 2008 WL 282473, *4 n. 2 (S.D.Ga. Jan. 31, 2008) ("Assuming Plaintiff appealed his

grievance to the Commissioner's Office, Plaintiff has still failed to satisfy the exhaustion

requirement. According to Plaintiff, he filed a formal grievance, on April 10, 2007. Defendant

Washington then had thirty (30) days to issue a written response. Defendant Donald would have then had ninety (90) days, or until approximately mid-to-late August, 2007, to respond to Plaintiff's appeal. However, Plaintiff commenced this action on May 24, 2007, well prior to deadline set for the Commissioner's Office to respond to any appeal that Plaintiff may have filed.") (citations omitted).

In light of this rule, it is clear that Plaintiff's First Amendment religious exercise claims and his other statutory claims for religious freedom must be dismissed because indisputably authentic documents, which Plaintiff himself provided to the court, conclusively establish that Plaintiff failed to exhaust his administrative remedies concerning his religious claims prior to initiating this suit.

In like manner, Plaintiff's First Amendment right of access to the courts is properly dismissed because indisputably authentic documents which Plaintiff himself provided, conclusively establish that Plaintiff initiated this suit prior to receiving the response to his final level appeal concerning his denial of access to courts claim.  For the same reasons, Plaintiff's retaliation claim against members of the PRC and claims of being denied equal protection must be dismissed for failure to fully exhaust his administrative remedies prior to filing suit.

Hence, all of the foregoing claims, i.e., the religious exercise claims and the access to courts claims, the retaliation claims and equal protection claims  must be dismissed for failure to exhaust.  Accordingly, the court will sua sponte enter summary judgment in favor of the Defendants as to all of these claims given that Plaintiff's own evidence conclusively establishes

that he did not exhaust his administrative remedies prior to commencing this suit.[6]

## B.  Defendants' Motion for Summary Judgment

### 1.  First Amendment Claims

In the alternative, Plaintiff's First Amendment denial of access to courts claims fails for yet another reason.  As pointed out by the Defendants, Plaintiff must not only allege but must prove an injury in order to sustain a First Amendment denial of access to courts claim.

The Court in Lewis v. Casey, 518 U.S. 343 (1996) held that:

> [b]ecause Bounds did not create an abstract freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.  That would be the precise analog of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary

---

[6]  "District courts have discretion to grant summary judgment sua sponte, even without notice in certain circumstances." Schwan-Stablio Cosmetics GmbH & Co. v. Pacificlink Intern. Corp., 401 F.3d 28, 33 (2d Cir. 2005). However, in doing so, a district court must "determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." Id. (internal quotation marks omitted).  Instantly, we determine that Plaintiff has had a full and fair opportunity to meet the proposition that he did exhaust.  In fact, it was Plaintiff who introduced the evidence of the filing of his grievances in an attempt to establish that he did exhaust and the material facts are undisputed vis-a-vis the timing of his grievances and, furthermore, the issue of exhaustion is a question of law. See, e.g., Island Park, LLC v. CSX Transp., 559 F.3d 96, 100-101 (2d Cir. 2009) (finding the sua sponte grant of summary judgment without prior notice to have been proper where "[t]he material facts are undisputed and the pre-emption issue is a question of law. . ."); Ramos v. Hawk-Sawyer, 212 Fed.Appx. 77, 78 (3d Cir. 2006) ("The conclusion of the Magistrate Judge that Ramos failed to comply with the PLRA's exhaustion requirement is a question of law"). See also Ramsey v. Coughlin, 94 F.3d 71, 73 (2d Cir. 1996)(finding as a condition for the District Court to sua sponte grant summary judgment without notice that "[t]he record must, therefore, reflect the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment."); In re September 11 Litigation, __ F.Supp.2d __, __, 2009 WL 2218232, at *4 (S.D.N.Y. July 27, 2009) (summary judgment may be sua sponte granted without prior notice but only where "the losing party must have submitted 'all of the evidentiary materials that a party might submit in response to a motion for summary judgment,' and 'those materials [must] show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law.'").  We further conclude, as permitted by Ramsey, that the record reflects Plaintiff's inability to enhance the evidence to establish that Plaintiff completely exhausted his remedies with respect to these three sets of claims **prior** to initiation of this suit.  Accordingly, summary judgment is properly entered sua sponte in favor of the Defendants as to these three sets of claims based on Plaintiff's failure to exhaust even without prior notice.

> [which claim would be rejected due to such healthy inmate lacking an actual injury so as to confer standing to bring suit].  Insofar as the right vindicated by Bounds is concerned, "meaningful access to the courts is the touchstone," [Bounds 430 U.S.] at 823 (internal quotation marks omitted) and the inmate must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance hindered his efforts to pursue a legal claim.  He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known.   Or that he suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable to even file a complaint.

Lewis, 518 U.S. at 351.  See also Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1998) (inmate must demonstrate an actual injury to sustain a claim of denial of access to courts).  Moreover, it is a plaintiff's burden to establish actual injury.  See McIlweine v. Harris, C/A No. 4:07-1117, 2008 WL 2909358, at *11 (D.S.C. July 22, 2008)("Actual injury must be more than theoretical deficiencies, it is showing that the alleged deficiencies have hindered or are hindering a prisoner's efforts to pursue a legal claim. Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Plaintiff has failed to meet this burden in that he has not alleged or shown that he has suffered any actual injury as a result of the LCDC not having a law library.").

As correctly noted by the Defendants, Plaintiff's denial of access to courts claim is based upon his contention that he was denied legal assistance "to file this Civil Action complaint." Dkt. [47] at 15.  See also Dkt. [8] at 9, ¶ 94.   As correctly noted by the Defendants, Plaintiff has not demonstrated any injury with respect to this suit.  He has filed and been able to litigate this suit quite well notwithstanding any alleged inability to access the mini law library or alleged inability to obtain a self help litigation manual.   Pointing these facts out was more than sufficient for the Defendants to meet their initial summary judgment motion to shift the burden to Plaintiff to come forward with evidence of an actual injury.  The only allegation he makes is that the

"Plaintiff suffered injury as a result, whereas this complaint was delayed in being filed 120 days, until Plaintiff could obtain help from a jailhouse lawyer[.]" Dkt. [8] at 9, ¶ 95.  This is, as a matter of law, not a sufficient "actual injury" if it qualifies as an injury at all, given that the alleged delay of 120 days did not cause any of Plaintiff's claims to fall outside of the statute of limitations.  Because Plaintiff failed to carry his burden to bring forth evidence of an actual injury, summary judgment is properly granted to Defendants on Plaintiff's First Amendment right of access to the courts claim.

Plaintiff also makes a First Amendment retaliation claim.  He makes multiple claims that his filing of grievances caused Defendants to retaliate against him in multiple ways, such as placing him in AC status and placing him on the RRL and possibly filing allegedly false misconduct charges against him.  See Dkt. [8] at 8, ¶ 88.

In order to prove a retaliation claim, a plaintiff must adduce evidence demonstrating: (1) that he engaged in constitutionally protected activity; (2) that he was subject to adverse actions by a state actor; and (3) the constitutionally protected activity was a substantial motivating factor in the state actor's decision to take adverse action.  Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997) (citing, Mt. Health City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1997)).  Even if a plaintiff establishes these elements, the defendant can still prevail if the state actor can show that it would have taken the same action without the unconstitutional factors.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. at 287.  In the prison context, the State actor may rebut a plaintiff's claim by showing that the State actor's actions were motivated by legitimate penological objectives.  Pratt v. Rowland, 65 F.3d 802 (9th Cir. 1995).  If the prison officials make such a showing, then Plaintiff cannot state a retaliation claim successfully.  Rauser v. Horn,

13

241 F.3d 330, 334 (3d Cir. 2001) ("This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."); Iseley v. Dragovich, 90 Fed.Appx. 577, 581 (3d Cir. 2004) (upholding summary judgment, the Court held that "[a]ssuming arguendo that Iseley met his initial burden under *Rauser* regarding the retaliatory denial of medical care, for all of the reasons set forth above and in the District Court's opinion, the defendants have shown that they would have arrived at the same decision regarding appropriate treatment for Iseley's dental problems, his nearsightedness, and for Hepatitis C condition in 1999, 2000 and 2001."); Carter v. McGrady, 292 F.3d 152, 153 (3d Cir. 2002) ("We conclude, assuming *arguendo* that Carter has correctly described the attitude at SCI-Mahanoy about jailhouse lawyering and that he has made out a *prima facie* case of retaliation, that there is no genuine issue of material fact that the prison officials would have disciplined Carter for these violations notwithstanding his jailhouse lawyering.").

　　To the extent that Plaintiff relies upon any allegation of falsifying misconducts in order to place him in Disciplinary Custody ("DC") so as to retaliate against him, then he has failed to sustain his burden of proving the causation prong of his retaliation claim.  This is so because, of the eight misconducts charged against Plaintiff between his arrival at SCI-Fayette on May 23, 2006[7] and his filing of the instant lawsuit on June 16 or 17, 2008, Plaintiff was found guilty of all of the misconducts, resulting in over 300 days of DC time.  Dkt. [52-23] at 2 to 3; Dkt. [47] at 9. The rule is that a finding of guilt in a misconduct proceeding essentially checkmates any claim

---

[7]  Dkt. [47] at 7 n. 5 (listing his date of arrival at SCI-Fayette as May 23, 2006).

that the misconduct was issued due to retaliation, and establishes as a matter of law a legitimate penological interest in issuing the misconduct.  Vercheres v. Wilkinson, 194 F.3d 1315 (6th Cir. 1999)(Table, Text in Westlaw)("Thus, Vercheres's retaliation claim was properly dismissed, as the finding that he was guilty of stalking satisfied the defendants' burden of showing that the guard would have charged him with a violation, even if Vercheres had not filed a grievance."); Harris-Debardelaben v. Johnson, 121 F.3d 708 (Table), 1997 WL 434357, at *1 (6th Cir. July 31, 1997); Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994) (being found guilty of a prison rule violation based on some evidence "essentially checkmates [the] retaliation claim."), cert. denied, 515 U.S. 1145 (1995); Jackson v. Madery, 158 Fed.Appx. 656, 662 (6th Cir. 2005) (same).

Plaintiff also claims retaliation in the form of having him placed on AC status or, as he puts it, "solitary confinement."  Dkt. [8] at 8, ¶ 88.

The Defendants adduced evidence of Plaintiff's history of problematic behavior at other institutions and at SCI-Fayette, including his pattern of inappropriate inter-actions with females at the various prisons.  See, e.g., Dkt. [47] at 9 to 13 ( recounting the history and citing to evidence in support thereof).  Defendants point out that this evidence, upon which the Defendants reasonably relied to determine Plaintiff should be placed in AC, conclusively establishes that the Defendants had legitimate penological interests in so placing Plaintiff on AC status and, thus, entitles them to summary judgment as to Plaintiff's retaliation claims.

The Court agrees. Even if we assumed, without deciding that Plaintiff had adduced sufficient evidence to carry his initial burden under Anderson v. Davila, that his multiple placements in AC permit an inference of retaliation, the Defendants adduced more than sufficient evidence to demonstrate that they would have placed Plaintiff in AC status notwithstanding his

filing of grievances because of his problematic behavior both at other prisons and at SCI-Fayette. This is clearly demonstrated by the fact of Defendants filing a transfer petition and recommending that Plaintiff be transferred (based upon the same problematic behavior that resulted in Plaintiff being placed in AC status), something that cannot be said to have been an adverse action under the facts of this case, since Plaintiff himself sought to be transferred out of SCI-Fayette. See, e.g., Dkt. [53-29] at 2 ("I deserve to be transferred out of this region")(capitalization changed); Dkt. [57-3] at 3 (Plaintiff sought to "have a separation from SCI Fayette entire institution.  And to be transferred to a prison of my choice inaccording [sic] to my level.") (capitalization changed).  The Defendants have demonstrated by their evidence that they would have taken the same actions irrespective of Plaintiff's filing of grievances.

In the face of such evidence, Plaintiff merely claims that the evidence relied upon by the Defendants to place him on AC status, and inferentially to seek his transfer out of SCI-Fayette, was not credible, was based on hearsay, and was fabricated and that the Defendants knew that it was fabricated.  See, e.g., Dkt. [65] at 14 to 15.  However, this is insufficient to meet his summary judgment burden.  Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"); Curl v. International Business Machines Corp., 517 F.2d 212, 214 (5th Cir. 1975) ("(T)he party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and ... the opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof.").  No reasonable jury could find for Plaintiff on his

16

retaliation claims based on the record evidence before the court.   Hence, the Defendants are entitled to summary judgment as to Plaintiff's retaliation claim.

### 2.  Eighth Amendment claims

Plaintiff also makes an Eighth Amendment claim of cruel and unusual punishment. Plaintiff bases this claim on his being placed in the AC when the Defendants were allegedly aware that Plaintiff had been prescribed psychiatric medication and that in another civil rights case brought by a different prisoner, a Department of Corrections psychiatrist has stated or testified that placement in AC for longer than 90 days may cause psychological damage.  Dkt. [8] at 12.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  The Supreme Court has explained that analysis of a violation of the Eighth Amendment involves a two pronged inquiry: (1) an objective inquiry into the qualitative nature of the harm suffered by the victim of the alleged punishment and (2) a "subjective inquiry" into the mind of the person inflicting the harm. See Wilson v. Seiter, 501 U.S. 294 (1991).  Accord  Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000)("A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components–one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect.").  The plaintiff bears the burden of proof as to both the subjective and objective prongs for, as the Court of Appeals has explained, in order to "survive a summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation."  Hamilton v. Leavy, 117

F.3d 742, 746 (3d Cir. 1997).

Plaintiff has adduced no evidence of the objective component.  In other words, while he points to "evidence" that a psychologist in another case stated that prolonged confinement in AC may cause psychological damage, Dkt. [65] at 37, Plaintiff has adduced no evidence that his being maintained in the AC caused him any particular psychological damage.[8]  In the alternative, even if he had any such evidence, he has not adduced any evidence of the subjective prong, i.e., he has introduced no evidence that the Defendants knew his placement and his continued confinement in AC caused Plaintiff any psychological harm.  In fact, the Defendants offered evidence to show that "Nifas's Individual Treatment Plan from October 2007, which was developed with the input of the institution's mental health and medical staff (including the psychiatrist and the psychologist manager) reflects that Nifas was to be in 'long term RHU placement.'" Dkt. [47] at 24.[9]  This clearly establishes the lack of any subjective indifference.  If the psychiatrist and psychological staff signed off on Plaintiff's being exposed to long term RHU placement, it cannot be said that the lay staff Defendants must have known of any excessive and specific risk to Plaintiff since they are required to rely on the experts.   Hence, as to both the subjective and objective prongs, Plaintiff fails to offer evidence in support thereof.

In the alternative, the Defendants have established that Plaintiff failed to exhaust any

---

[8]  Plaintiff does note that he attempted suicide in July 2007, Dkt. [65] at 36 to 37.  However, he adduces no expert psychological opinion as would be required to establish a causal connection between Plaintiff's suicide attempt.  Furthermore, his most recent stay in AC had just begun the very date of his attempt, i.e., July 13, 2007.  Dkt. [47] at 10 to 11.

[9]  Plaintiff disputes that the form indicates he was to be in long term RHU placement. Dkt. [65] at 37 n.5.  However, the form notes under "Problems and Goals" "1.  Long Term RHU placement."  The form has been signed by a psychology staff member and a psychiatrist.  The form also notes that Plaintiff will have monthly psychiatric rounds and weekly psychological rounds. Dkt. [49-6] at 21.

claim as to his suffering any psychological harm from his placement on AC.   Dkt. [47] at 23

("He has filed three grievances concerning medical care (all after his complaint was filed) and

none relates to this issue.").

Accordingly, the Defendants are entitled to summary judgment as to Plaintiff's Eighth

Amendment claims for any of the foregoing reasons.

### 3.  Fourteenth Amendment claims

Next Plaintiff makes two Fourteenth Amendment claims: one for the alleged denial of

equal protection and second for the denial of procedural due process.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall

"deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend.

XIV, § 1.   In order to establish an equal protection claim, plaintiff must show that: (1) the

person, compared with others similarly situated, was selectively treated, and (2) the selective

treatment was motivated by an intention to discriminate on the basis of impermissible

considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights,

or by a malicious or bad faith intent to injure the person.  See   Zahra v. Town of Southold, 48

F.3d 674, 683 (2d Cir. 1995).   Essentially, to demonstrate an equal protection violation, an

inmate has the burden of proving under the second prong the existence of purposeful

discrimination.  Hernandez v. New York, 500 U.S. 352 (1991); McCleskey v. Kemp, 481 U.S.

279, 292 (1987).  Official action does not violate the Equal Protection Clause solely because it

results in a disproportionate impact; proof of discriminatory intent or purpose is required to show

a violation.  Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S.

252, 265 (1977); Washington v. Davis, 426 U.S. 229, 239 (1977);  Stehney v. Perry, 101 F.3d

925, 938 (3d Cir. 1996).  Moreover, it is Plaintiff's burden to prove that he was similarly situated

to those whom he alleges were treated differently.  Logan v. Liberty Healthcare Corp., 416 F.3d

877, 882 (8th Cir. 2005) (stating that "it is a plaintiff's burden to produce specific, tangible

evidence showing a disparity in the treatment of similarly situated" persons) (internal citations

and punctuation omitted);  Dahlsten v. Lee, 531 F.Supp.2d 1029, 1043 (N.D.Iowa, 2008) ("A

plaintiff bears the burden of proving that he is similarly situated to those whom he compares

himself to 'in all relevant respects.'");  Ganley v. Minneapolis Park and Recreation Bd., Civil File

No. 05-2135, 2006 WL 2671295, at *3 (D.Minn. Sept. 18, 2006)("A plaintiff bears the burden of

proving that he is similarly situated to those whom he compares himself to 'in all relevant

respects.'"), aff'd, 491 F.3d 743 (8th Cir. 2007).

Instantly, Plaintiff asserts that he was similarly situated with several other prisoners,

whom he alleged received privileges in AC status that he was denied and who were not placed on

the RRL as he had been, even though they allegedly posed greater behavior problems.  See, e.g.,

Dkt. [53-56] at 1 to 8 (listing 7 prisoners and providing some affidavits from them as to their

receipt of privileges in AC).  As the Defendants point out, in the context of such individualized

discretionary assessments of placement on AC status and/or on the RRL, it is difficult, if not

impossible to establish that anyone is similarly situated to another so as to succeed on an equal

protection theory.  See e.g., Rowe v. Cuyler, 534 F.Supp. 297, 301 (E.D. Pa. 1982)(it is difficult

to believe that any two prisoners could be considered 'similarly situated' for the purpose of

judicial review on equal protection grounds of broadly based discretionary decisions [such as

parole determinations]"), aff'd, 696 F.2d 985 (3d Cir. 1982)(Table); Perry v. Vaughn, NO.

CIV.A. 04-CV-0934, 2005 WL 736633, at *11 (E.D.Pa. Mar 31, 2005)("Here, however,

Petitioner has not identified any other similarly-situated individuals who the Board treated more favorably without a rational basis. With no averments of fact alleging the different treatment of similarly-situated persons, Petitioner cannot state a violation of equal protection. Consequently, we must dismiss Petitioner's equal protection claim as well.").  Hence, it is doubtful, as Defendants point out, that Plaintiff even established that he was similarly situated with the other prisoners he points to.  However, even if he had established some similarities, he failed to adduce evidence that he was similarly situated with those prisoners "in all relevant respects" in consideration of AC status and/or placement on the  RRL.  Dahlsten v. Lee, 531 F.Supp.2d at 1043.  In fact, Defendants adduced evidence affirmatively demonstrating that Plaintiff was not so similarly situated with any of the prisoners with whom he seeks to compare himself and from whom he obtained affidavits found at Dkt. [57-55] at 1 to 8.  Dkt. [73-2] at 5 to 10 (affidavit recounting significant differences between Plaintiff and the seven listed inmates).  Accordingly, the Defendants are entitled to summary judgment as to Plaintiff's Equal Protection claim.

    Plaintiff also makes a procedural due process claim against the Defendants.  He alleges that the Defendants violated his procedural due process rights when they "[f]ailed to provide the Plaintiff with the reason of his solitary confinement [i.e. placement in AC] on July 13, 2007, August 16, 2007, February 7, 2008 and Aril [sic] 10, 2008. . . . Failed to provide the Plaintiff with what credible information was relied upon to continue Plaintiff's solitary confinement on August 16, 2007, February 7, [2]008, and Aril [sic] 10, 2008, specifically required in DOC ADM-802 policy procedures" and failed to provide him with a hearing prior to being placed on the RRL.  Dkt. [8] at 10, ¶ 98.  Plaintiff also claims his procedural due process rights were violated when some of the Defendants refused to process his grievances.  Id., at 10, ¶ 100.

The Fourteenth Amendment provides in relevant part that "nor shall any State deprive any person of life, liberty, or property, without due process of law."  The "due process of law" essentially requires that the government provide a person notice and opportunity to be heard in connection with the deprivation of life, liberty or property.  <u>Zappan v. Pennsylvania Board of Probation and Parole</u>, 152 Fed.Appx. 211, 220 (3d Cir. 2005)("The essential requirements of any procedural due process claim are notice and the opportunity to be heard.").  Hence, to establish a prima facie case of a procedural due process violation, a plaintiff must establish:[10] (1) the existence of a liberty or property interest (2) that the state deprived the person of and (3) that the deprivation was accomplished without procedural protections of notice and an opportunity to be heard.  See <u>Rusnak v. Williams</u>, 44 Fed.Appx. 555, 558 (3d Cir. 2002)("Procedural due process claims, to be valid, must allege state sponsored-deprivation of a protected interest in life, liberty or property. If such an interest has been or will be deprived, procedural due process requires that the governmental unit provide the individual with notice and a reasonable opportunity to be heard.")(citation omitted); <u>Castro Rivera v. Fagundo</u>, 310 F.Supp.2d at 434 (listing elements of prima facie case).

For present purposes, our procedural due process analysis involves a two step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property

---

[10]  It is clear that Plaintiff has the burden.  <u>See</u>, <u>e.g.</u>, <u>Smith v. City of Unadilla</u>, 510 F.Supp.2d 1335, 1346 (M.D. Ga. 2007)("A plaintiff who asserts that a procedural due process violation has occurred, bears the initial burden of establishing that a protected property interest exists."); <u>Castro Rivera v. Fagundo</u>, 310 F.Supp.2d 428, 434 (D.Puerto Rico 2004)("It is not sufficient that a deprivation has occurred. Plaintiffs carry the burden of pointing to the lack of constitutionally sound proceedings at the state level. *Rumford*, 970 F.2d at 999. Plaintiffs must present evidence that the state does not have available review mechanisms comporting with minimum due process requirements."), <u>aff'd</u>. 129 Fed.Appx. 632 (1st Cir. 2005).

interest within the contemplation of the Due Process clause of which he has been deprived and, if

so, the second question is whether the process afforded the complaining party to deprive him of

that interest comported with constitutional requirements.  Shoats v. Horn, 213 F.3d 140, 143 (3d

Cir. 2000).

Defendants argue that Plaintiff has failed to establish that his placement on AC and/or his

placement on the RRL deprived him of a liberty interest.  Alternatively, they point out that

Plaintiff received all of the process that he was entitled to even if his placements involved a

liberty interest.

A protected liberty interest may arise from one of two sources: (1) directly from the

Fourteenth Amendment's due process clause itself or (2) from state law.  Hewitt v. Helms, 459

U.S. 460, 466 (1983).

There is no liberty interest created directly by the Fourteenth Amendment that prevents an

inmate from being subjected to AC status.  See Sandin v. Conner, 515 U.S. 472, 484 (1995)

("Conner asserts, incorrectly, that any state action taken for a punitive reason encroaches upon a

liberty interest under the Due Process Clause even in the absence of any state regulation");

Stephany v. Wagner, 835 F.2d 497, 499 (3d Cir. 1987)("the Due Process Clause does not give a

prisoner a liberty interest in remaining in the general prison population").

Addressing the issue of state created liberty interests, the United States Supreme Court in

Sandin v. Conner, 515 U.S. 472, 484 (1995) made a sea change in the analysis courts had used

prior to the Sandin decision.   Prior to Sandin, the courts were instructed to determine whether

the State had issued regulations or rules and whether in those promulgations the State had used

"language of an unmistakably mandatory character" such that the incursion on liberty would not

occur "absent specified substantive predicates."  Hewitt v. Helms, 459 U.S. 460, 471-72.  (1983).

However, in Sandin, that methodology was rejected.  Sandin, 515 U.S. at 483-84 n.5. In Sandin

the Supreme Court "abrogated the methodology of parsing the language of particular

regulations."  Wilkinson v. Austin, 545 U.S. 209, 222-23 (2005) (describing the court's holding

in Sandin ).  "After Sandin, it is clear that the touchstone of the inquiry into the existence of a

protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the

language of regulations regarding those conditions."  Id. at 223 (quoting Sandin, 515 U.S. at

484).

Rather than searching state prison regulations or laws for mandatory language, the Sandin

court directed that we are to analyze the nature of the deprivation to determine if a liberty interest

is implicated.   Specifically, the Sandin court held that a state government "may under certain

circumstances create liberty interests which are protected by the Due Process Clause.  But these

interests will be generally limited to freedom from restraint which, while not exceeding the

sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of

its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to

the ordinary incidents of prison life."  515 U.S. at 483.  The meaning of these words or this test is

not self evident.  Skinner v. Cunningham, 430 F.3d 483 (1st Cir. 2005)("The hardship test has

itself become the source of major disagreement.").  The test apparently requires a determination

of what constitutes the ordinary incidents of prison life, which has been referred to as the

"baseline" or "base for comparison,"[11] so as to determine whether a particular deprivation can be

---

[11] Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir. 1999)("The District of Columbia Circuit uses the 'most
restrictive' conditions of administrative confinement as the base for comparison. . . .").

said to be atypical and significant departure therefrom.  See, e.g., Wilkinson v. Austin, 545 U.S.

at 223.[12]

  The Court of Appeals for the Third Circuit has provided some guidance regarding this

issue.  Among the first attempts to address this issue, the Court of Appeals stated that "the

baseline for determining what is 'atypical and significant' – the 'ordinary incidents of prison life'

- is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his

or her conviction in accordance with due process of law."  Griffin v. Vaughn, 112 F.3d 703, 706

& n. 2 (3d Cir. 1997).  Unfortunately, there are several difficulties with this formulation.  One

may be that it is tautological.  Defining a liberty interest for purposes of determining whether

certain procedures are constitutionally required by saying that a deprivation does not constitute a

liberty interest if it constitutes a deprivation that a prisoner may reasonably expect in accordance

with due process of law appears to be a tautology, i.e., defining a word by using that same word

or a form of the same word.[13]  Even if not tautological, what is apparently required or permitted

by such a formulation is quite open ended and provides little practical guidance.[14]  However,

---

[12]  Plaintiff contends that Wilkinson established "more stringent rights if an inmate is being detained in
solitary based upon an administrative detention versus a misconduct detention."  Dkt. [55] at 7.  Plaintiff
is simply wrong and has it absolutely backwards.  See, e.g., Kellames v. Mahoney, No. CV 07-14, 2008
WL 697587, at *3 n.2 (D.Mont. March 13, 2008)("A somewhat greater burden is imposed on prison
officials who are disciplining inmates 'for specific, serious misbehavior, [Wilkinson, 545 U.S.] at 228,
than on officials who are only deciding where to put them, apart from any disciplinary sanction. Id. at
228-29 ").  Accord Manibusan v. Alameida, No. C 04-2611,  2006 WL 496041, at *5 (N.D.Cal. Feb. 28,
2006).

[13]  The formulation may not be a tautology if the formulation means in accordance with "substantive due
process, i.e., in accordance with fundamental fairness as opposed to "procedural due process."

[14]  The Court of Appeals continues to adhere to the standard from Griffin.  See, e.g., Bacon v. Minner,
229 Fed.Appx. 96, 98 (3d Cir. 2007).

even if the formulation does not, the precise holding of <u>Griffin</u> perhaps provides more guidance; from <u>Griffin</u> we know that a prisoner placed in the conditions of Administrative Custody for a period of 15 months does not implicate a liberty interest.  <u>See id</u>.[15]

Perhaps as a consequence of the fluidity of the test for atypicality, the Court of Appeals has also emphasized that this is a fact intensive inquiry.  <u>Wilkins v. Bittenbender</u>, __ Fed.Appx. __, 2007 WL 708993, at *2  (3d Cir. 2007)("In order to [determine whether a deprivation is atypical and significant], a court should perform a fact-specific inquiry evaluating 'the duration of disciplinary confinement and the conditions of that confinement in relation to other prison conditions.'")(quoting <u>Mitchell v. Horn</u>, 318 F.3d 523, 531 (3d Cir. 2003)).

Significantly, for purposes of deciding this motion for summary judgment, it is a Plaintiff's burden to establish the existence of a liberty interest.  <u>Zigmund v. Foster</u>, 106 F.Supp.2d 352, 360 (D. Conn. 2000)("The plaintiff bears the burden of demonstrating the existence and infringement of a protected liberty or property interest.").  Hence, it is Plaintiff's burden to adduce evidence that the conditions he faced were both atypical and significant hardships in relation to the ordinary incidents of prison life.   <u>Frazier v. Coughlin</u>, 81 F.3d 313,

_____

[15]  The Circuit Court's other statements on this issue have varied.  <u>Compare</u>  <u>Leamer v. Fauver</u>, 288 F.3d 532, 546 (3d Cir.  2002)("under <i>Sandin</i> a court must assess whether administrative segregation, or its concomitant conditions, constitute an 'atypical and significant hardship' by comparing the circumstances of Leamer's placement with those of others within comparable confinement.");  <u>Shoats v. Horn</u>, 213 F.3d 140, 144 (3d Cir. 2000)(in determining what constitutes an atypical and significant hardship for those in disciplinary confinement, the question is "whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement.").  <u>Griffin v. Vaughn</u>, 112 F.3d 703, 708 (3d Cir. 1997)("It is thus apparent that in the penal system to which Griffin was committed with due process of law, it is not extraordinary for inmates in a myriad of circumstances to find themselves exposed to the conditions to which Griffin was subjected."). <u>Griffin</u> appears to reject that assertion that the base of comparison is with the conditions of the inmates in the general population of the single prison where the prisoner-plaintiff's deprivation took place.  <u>Id</u>., at 706 n.2.

317 (2d Cir. 1996)("To prevail, Frazier must establish . . . that the confinement or restraint

creates an 'atypical and significant hardship' under *Sandin*"); <u>Vasquez v. Coughlin</u>,  2 F.Supp.2d

255, 260 (N.D.N.Y. 1998)("Plaintiff has the burden of proving that the conditions of his

confinement constituted an atypical, significant hardship in relation to the ordinary incidents of

prison life in order to recover damages under 42 U.S.C. section 1983."); <u>Keel v. Dovey</u>, 459

F.Supp.2d 946, 955 (C.D.Cal. 2006)("Plaintiff has failed to carry her burden of raising a triable

issue of material fact on whether her placement in Ad Seg qualifies as an  'atypical and

significant hardship[ ]... when compared to the burdens of ordinary prison life' ")(some internal

quotation marks omitted).  <u>Accord</u> <u>Wilkins v. Bittenbender</u>, __ Fed.Appx. __ , 2007 WL 708993

at *2 (3d Cir. 2007)("Nor has [the prisoner-plaintiff] provided any evidence that the conditions

during his stay in administrative segregation involved atypical or significant hardship.").

Instantly,  Plaintiff offered little to no evidence of the type of deprivations he encountered

in AC, and he has offered no evidence at all with respect to the atypicality of the alleged

hardships that he suffered, or, in other words, the comparability of the hardships he suffered

while in AC with what other prisoners may ordinarily expect to encounter.  Thus, without a base

of comparison, there is no evidence to establish the atypicality of the hardships.   In fact, under

the reasoning of <u>Shoats v. Horn</u>, in order to succeed, it appears that Plaintiff must show that his

conditions were harsher than the conditions of others throughout Pennsylvania's correctional

facilities who are in solitary confinement.  <u>Shoats v. Horn</u>, 213 F.3d 140, 144 (3d Cir. 2000)(in

determining what constitutes an atypical and significant hardship for those in disciplinary

confinement, the question is "whether the conditions of his confinement in disciplinary

segregation were significantly more restrictive than those imposed upon other inmates in solitary

confinement."). See also Wagner v. Hanks, 128 F.3d 1173 (7th Cir. 1997)(State prison inmate's due process claim based on inmate's placement in disciplinary segregation was to be evaluated by comparing conditions of inmate's confinement with conditions of segregation in state's entire prison system, not just inmate's individual prison.).   The same can be said of Plaintiff's failure to adduce any evidence of the atypicality of being placed on the RRL.   Because Plaintiff offers no evidence that his conditions in AC or that placement on the RRL were "significantly more restrictive than those imposed upon other inmates in solitary confinement" pursuant to Shoats or any evidence as to the likelihood and frequency and duration of stays in conditions like those of the AC and/or of stays on the RRL that were visited upon other prisoners, Plaintiff has failed to establish that the conditions he faces are an atypical and significant hardship.   Thus, Plaintiff has failed to establish by evidence that he has been deprived of a liberty interest at all by his placement in the AC for an aggregated  total of 178 days prior to filing the instant complaint.

Moreover, it appears that placement on the RRL could not amount to a deprivation of a liberty interest at all because, at most, it accomplishes only a change in the identity of the decision maker as to whether Plaintiff should be released from the AC or not.   Rather than the Program Review Committee making such a decision, the decision is reserved to the Secretary or his designee.   Such a change in who the decision maker is would not appear to this court to implicate a liberty interest and, indeed, it appears that placement on the RRL has been held to not deprive a prisoner of a liberty interest as a matter of law.   See, e.g.,  Bowen v. Ryan, 248 Fed.Appx. 302, 304 (3d Cir. 2007)("Appellant's claim that he was placed on the Restricted Release List without due process was properly dismissed. Placement on this List did not deprive Bowen of his liberty, privileges, or any other constitutionally protected liberty interest.").

28

Furthermore, the court agrees with the Defendants who point out that Plaintiff was not deprived of a liberty interest by his stay in the AC because from July 13, 2007, i.e., the date Plaintiff was placed in AC, until June 18, 2008, the date the Defendants claim Plaintiff filed his complaint herein, Plaintiff spent only 178 days in AC and only 90 days on the RRL and 160 days in DC.  Dkt. [47] at 19.   Such a relatively short stay in the AC prior to filing the instant complaint simply does not implicate a liberty interest, as Defendants point out. Griffin v. Vaughn, 112 F.3d 703 (3d Cir. 1997) (confinement in administrative custody for fifteen months with only one hour of exercise per day five days per week did not amount to an atypical and significant hardship and thus did not deprive prisoner of a liberty interest);  Washington-El v. Diguglielmo, No. 06-CV-4517, 2008 WL 2954745 (E.D.Pa. July 29, 2008)(17 months in administrative custody is not atypical and significant so as to qualify as a liberty interest). Hence, even assuming that Plaintiff did not receive any hearing whatsoever prior to filing this suit, which is affirmatively rebutted by the record that indicates he had several PRC reviews after his placement in AC, because the time he spent in the administrative custody prior to filing this suit was less than 15 months (actually it was a little less than six months), no liberty interest was at stake pursuant to Griffin, and hence, Plaintiff was not entitled under the Federal Constitution to any procedural protections whatsoever given he was not deprived of a liberty interest.[16]

---

[16]  To the extent that Plaintiff would wish to have the court consider his time of confinement in AC after he filed the instant complaint, see, e.g., Dkt. [65] at 33 (Plaintiff "is still wrongfully confined to this day, July of 2009"), such would be improper given that such facts are, of necessity, facts occurring after the initiation of this suit and therefore not properly part of this suit, nor have they been made a part thereof by Plaintiff's seeking leave to file a supplemental complaint. A supplemental pleading adds to the original some matter occurring after the beginning of the action or after a responsive pleading has been filed. Klee v. Pittsburgh & W. Va. Railway Co., 22 F.R.D. 252, 254 (W.D. Pa. 1958).  The language of Rule 15(d), which governs supplemental complaints, makes strikingly clear that a supplemental complaint may not be filed without leave of court.  See, e.g., Dillard v. Merrill Lynch, Pierce, Fenner &

(continued...)

Alternatively, even if Plaintiff did establish a genuine issue of material fact with respect to the existence of a liberty interest, he has failed to show that the process that he did receive in connection with his being placed on AC and or being placed on the RRL was constitutionally inadequate.

The Defendants adduced evidence of all of the process Plaintiff received, Dkt. [47] at 19 to 20, including periodic reviews by the PRC and hearings by the PRC within days of his AC placements on August 10, 2007, February 16, 2007 and April 10, 2008.  The Defendants also adduced evidence that since he was placed on the RRL, he was reviewed by the PRC on April 10, 2008, July 1, 2008 and September 25, 2008 (which would appear to be his 90-day reviews).

In addition, Plaintiff's own evidence establishes that after being placed on the RRL, he grieved such placement on the RRL, as well as addressed such placement on the RRL with the PRC, and that he received explanations for such placement and an opportunity to be heard.  Dkt. [53-31] (Letter from Defendant Popovich dated March 26, 2008 providing Plaintiff the reasons for his placement on the RRL);  Dkt. [53-34] at 2 (PRC hearing held on 4/10/08 wherein Plaintiff was again informed of being placed on RRL); Id., at 3 (Plaintiff's appeal of the PRC hearing wherein Plaintiff asserts that "I am appealing the P.R.C. hearing in which I was wrongfully placed on the Restricted Release list" and also asserting that he has no knowledge of the facts for placing him on the RRL);  Dkt. [53-47] at 8 (indicating he raised this issue with the PRC at his 90 day review hearing held on July 1, 2008); Dkt. [53-49] at 2 (Grievance No. 235387 wherein

---

[16](...continued)
Smith, Inc., 961 F.2d 1148, 1156 (5th Cir.  1992)("Dillard filed his supplemental complaint (which was stricken for failure to ask leave of court to file it)"); ECL Industries, Inc. v. Ticor and Southern Pacific Co., NO. 85 CIV. 9592 , 1986 WL 9222, at *2 (S.D.N.Y. Aug. 18, 1986)("Ticor filed a supplemental complaint (without seeking leave of court, as required by Rule 15(d), F.R.Civ.P.)").

Plaintiff asserted "On July 1, 2008, a 90 day review was held. . . I was present and address[ed] to

the adjustment committee [i.e. the PRC] my concerns that I was wrongfully put on the Restricted

Release List (RRL) and the institution never gave me a hearing for such placement, all of my

procedural due process rights has [sic] been violated."); Dkt. [53-54] at 2 (Grievance No. 245935

wherein Plaintiff stated "On September 26, 2008, I appeared PRC hearing held on Sept. 26, 2008

Friday.  This was a 90 day review in which I was present at the hearing.  I addressed my

problems and concerns: that I never had a hearing to be put on Administrative custody.  PRC

conductor Major Zaken told me that Administration Policy does not require me to have a hearing

and they do not have to give me a PRC hearing to be put on administrative custody restricted

release list.").  All of this is sufficient process so as to satisfy the procedural due process clause.

Cf.  Shoats v. Horn, 213 F.3d 140, 144 (3d Cir.2000) (periodic reviews by PRC of placement in

Administrative Custody for 8 years satisfied due process).

        To the extent that Plaintiff complains that he was required to have received pre-

deprivation notice and an opportunity to be heard, i.e., he was required by procedural due process

to receive notice that he was being placed on the RRL or in AC **before** actually being placed

therein and an opportunity to be heard **prior** to being placed therein or thereon,[17] Plaintiff is

mistaken.  Assuming that he was required by procedural due process to be given notice and an

opportunity to be heard prior to being deprived of a liberty interest, he would be required to show

when he was deprived of a liberty interest so as to enable this court to determine when the pre-

---

[17]  See, e.g., Dkt. [65] at 28 (Defendants "violated the Plaintiff's Fourteenth Amendment rights, when
they failed to provide the plaintiff with a non-disciplinary administrative custody hearing informing the
plaintiff of the reason relied upon and evidence leading to restrictive confinement and an opportunity to
rebut the allegations **before** the placement in restrictive confinement." (emphasis added).

deprivation process was required.  Knowing as we do that 15 months in AC does not deprive a

prisoner of a liberty interest pursuant to Griffin v. Vaughn, and knowing that Plaintiff was placed

on the RRL and thereafter grieved such placement and indisputably received notice of the

reasons for his placement thereon via the Popovich letter dated March 26, 2008, the fact that

Plaintiff was in AC only for, at most, 90 days prior to receiving a PRC review, when Plaintiff had

an opportunity to be heard and to inquire as to the reasons for him being so placed on AC and/or

on the RRL, we hold as a matter of law that such a short duration of exposure to the conditions of

the AC and being placed on the RRL did not deprive him of a liberty interest and hence, he did in

fact receive notice and an opportunity to be heard **prior** to the deprivation of an actual liberty

interest, assuming, contrary to what we know, that being placed on the RRL constitutes a liberty

interest at all.   At best, Plaintiff might be able to show that after a greater length of time, for

example, 15 months *a la* Griffin, in the AC that he was deprived of a liberty interest, but prior to

that more extended time, the record demonstrates that Plaintiff received much process and

several explanations of why he was initially placed there and continued there and given several

opportunities to be heard as to those explanations.  This is sufficient.  Hence, Plaintiff has failed

to show that even if he were deprived of a liberty interest at some point in time after being in the

AC, such was accomplished without the procedures required by procedural due process.

   To the extent that Plaintiff complains he did not receive the procedures he was allegedly

entitled to under DOC regulations,[18] such simply fails to establish a procedural due process

violation.  The Supreme Court has observed that "[a] liberty interest is of course a substantive [in

---

[18] See, e.g., Dkt. [65] at 27 wherein Plaintiff states that "Plaintiff does not challenge his transfer to
regular AC status for investigation as violative of his due process rights.  Rather, Plaintiff challenges the
procedures."

contrast to a procedural] interest of an individual;  it cannot be the right to demand needless

formality.  Process is not an end in itself.   Its constitutional purpose is to protect a substantive

interest to which the individual has a legitimate claim of entitlement. . . .  The State may choose

to require procedures for reasons other than protection against deprivation of substantive  rights,

of course, but in making that choice the State does not create an independent substantive right."

Olim v. Wakinekona, 461 U.S. 238, 250-51 (1983) (internal quotations, citations and footnotes

omitted.  See also United States v. Jiles, 658 F.2d 194, 200 (3d Cir. 1981)("The simple fact that

state law prescribes certain procedures does not mean that the procedures thereby acquire a

federal constitutional dimension.") (quoting Slotnick v. Staviskey, 560 F.2d 31, 34 (1st Cir.

1977));[19] Shango v. Jurich, 681 F.2d 1091, 1101-02 (7th Cir. 1982) ("[A] state created procedural

right is not itself a liberty interest.... States may decide to engage in such proceedings, but the due

---

[19]  As the Court of Appeals for the Third Circuit explained:

> The fact that Pennsylvania regulations provide for hearings after transfer to
> administrative custody is not relevant to a determination of whether federal procedural
> due process is required. *See Hewitt v. Helms*, 459 U.S. 460, 470 (1983)(The mere fact
> that Pennsylvania has created a careful procedural structure to regulate the use of
> administrative segregation does not indicate the existence of a protected liberty interest.).
> The process afforded by state law is not relevant in determining whether there is a state
> created right that triggers due process protection. *Olim v. Wakinekona*, 461 U.S. 238
> (1983). ("The State may choose to require procedures for reasons other than protection
> against deprivation of substantive rights, of course, but in making that choice, the State
> does not create an independent substantive right.")

Griffin v. Vaughn, 112 F.3d 703, 709 n.3 (3d Cir. 1997).   Not only does the State's creation of
procedures before a certain deprivation can occur fail to establish that Plaintiff has a liberty interest in
what he was deprived of, but in addition, Plaintiff has no constitutional liberty interest in the Defendants
following the procedures allegedly mandated by state law.  River Park, Inc. v. City of Highland Park, 23
F.3d 164, 166 (7th  Cir. 1994) ("the Constitution does not require state and local governments to adhere to
their procedural promises"); Wilson v. Formigoni, 42 F.3d 1060, 1066 (7th Cir. 1994) ("[S]tate-created
procedural requirements do not, standing alone, constitute protected liberty or property interests or create
substantive entitlements.") (citations omitted).  Hence, neither the deprivation nor the failure to follow
state mandated procedures deprived Plaintiff of a liberty interest here.

process clause does not compel them to do so because no constitutionally cognizable substantive

interest of the prisoner is at stake."); Hayes v. Muller, No. 96-3420, 1996 WL 583180, at *7

(E.D. Pa.  Oct. 10, 1996) ("[A] state does not violate an individual's federal constitutional right to

procedural due process merely by deviating from its own established procedures.").[20]  Having

been deprived of no liberty interest by either his placement in the AC nor his placement on the

RRL,  the Defendants' alleged failure to abide by DOC policies requiring certain procedures be

followed fails to state a procedural due process claim.

Hence, on this record, no reasonable jury could find for the Plaintiff on his procedural due

process claims.

Having determined to grant summary judgment in favor of Defendants as to all of

Plaintiff's federal law claims, the Court, in the exercise of its discretion, declines to entertain any

---

[20]  The foregoing reasoning regarding state procedures also adequately addresses Plaintiff's claim that he
was denied procedural due process by the Defendants in their denying or refusing to respond to his
grievances.  See, e.g., Dkt. [8] at 10, ¶ 100;  Dkt. [65] at 6 (referring to the "due process of grievance
procedures").  Anderson v. Colorado Dept. of Corrections, 185 F.3d 873 (Table), 1999 WL 387163, at *2
(10th Cir. 1999)("petitioner's allegations relating to the requirements of the Department of Corrections
grievance procedure do not support a due process claim because those procedures do not create any
liberty interest in the incarcerated petitioner. The failure to conduct an investigation or respond to
petitioner's grievances does not impose an atypical and significant hardship"); Metcalf v. Veita, 156 F.3d
1231 (Table), 1998 WL 476254, *2 (6th Cir. 1998)("As to the conduct attributed to the warden
personally, consisting of denying Metcalf's appeals and grievances, Metcalf did not state a due process
claim because he suffered no atypical and significant hardship as a result."); Adams v. Rice, 40 F.3d 72,
75 (4th  Cir. 1994).
         Nor would either denying his grievances or refusing to process his grievances violate Plaintiff's
right to petition the government as he seems to argue.  Dkt. [57] at 25 ("In the instant case, plaintiff was
denied every opportunity to petition the government for redress of grievances . . . . Defendant Coleman
refuse[d] to answer Plaintiff's" appeals.).  Cole v. Mistick, NO. CIV.A. 05-1476, 2009 WL 1160962
(W.D.Pa. April 28, 2009) ("the prisoner's right to petition the government for redress is the right of
access to the courts, which is not compromised by the prison's refusal to entertain his
grievance.")(quoting Flick v. Alba, 932 F.2d 728, 729 (8th  Cir. 1991) (per curiam)).

State law claims pursuant to the Court's supplemental jurisdiction.[21]

Accordingly, it is hereby ORDERED that the Defendants' Summary Judgment Motion, Dkt. [46], is GRANTED.

It is further ORDERED that all other pending motions are hereby DENIED as moot, including Plaintiff's own summary judgment motion.  The Clerk is to mark the case closed.

/s/ *Amy Reynolds Hay*
Chief United States Magistrate Judge

Dated: 30 September, 2009

cc:     Rasheed Nifas
        CA-4950
        SCI-Fayette
        P.O. Box 999
        LaBelle, PA 15450

        All counsel of record by Notice of Electronic Filing

_____

[21]  See, e.g., Boneburger v. Plymouth Township, 132 F.3d 20, 23 n.1 (3d Cir. 1997)("where federal claims are dismissed before trial, the district court 'must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'")(quoting Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995));  28 U.S.C. § 1367(c)(3) which permits a district court to "decline to exercise supplemental jurisdiction over a [state law] claim ... if [it] has dismissed all claims over which it has original jurisdiction . . . .").   The grant of summary judgment by a court on the federal claims is included within the meaning of the phrase contained in Section 1367(c)(3), i.e., "dismissed all claims."  Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir. 1976) ("If it appears that the federal claim is subject to dismissal under F.R.Civ.P. 12(b) (6) or could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances.");  O'Brien v. Maui County, 37 Fed.Appx. 269, 273 (9th Cir. 2002) ("Having disposed of all of O'Brien's federal claims on summary judgment, the district court declined to assert supplemental jurisdiction over O'Brien's state law negligence claims. O'Brien contends that this constituted reversible error.  There is no basis for her contention. Under 28 U.S.C. § 1367(c)(3), a district court may, in its discretion, decline to exercise supplemental jurisdiction over related state law claims once it has 'dismissed all claims over which it has original jurisdiction....' As the district court properly dismissed the federal claims, it did not abuse its discretion in dismissing the state law negligence claims as well.")(footnote omitted).